FILED

*UNITED STATES DISTRICT COURT*
*DISTRICT OF NEW MEXICO*

04 NOV 15 PM 2: 02

CLERK-ALBUQUERQUE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, for the use of
BELT CON CONSTRUCTION, INC.,

                  Plaintiff,

     v.

METRIC CONSTRUCTION CO., INC. and
SAFECO INSURANCE COMPANY OF
AMERICA,

                  Defendants.

No. CIV 02-1398 JP/LAM

## METRIC'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

The above captioned matter came on regularly for Bench Trial from

November 1, 2004 through November 4, 2001, before the Honorable James

Browning in the United States District Court for the District of New Mexico.  Present

representing the Plaintiff, United States of America for the use of Belt Con

Construction, Inc., was William J. Derrick and present representing Defendants,

Metric Construction Company, Inc. and Safeco Insurance Company of America, was

Steven D. Meacham.  The Court, having considered the evidence presented at the

trial, as well as the exhibits and being fully advised in the premises, makes the

following Findings of Fact and Conclusions of Law:

ORIGINAL

**DANN & MEACHAM**
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770 3339

103

## II. FINDINGS OF FACT

1. This is an action brought pursuant to the Miller Act, 40 U.S.C. Sections 3131-3133. Jurisdiction over this matter exists by virtue of the provisions of the Miller Act, as well as 28 U.S.C. Sections 1331, 1345, and 1352.

2. Venue is properly laid in this District pursuant to the Miller Act and 28 U.S.C. Section 1391(b)(2).

3. Metric contracted with the GSA to construct the Dormitory, Physical Training and Security Buildings, FLETC Campus in Artesia, New Mexico (the "Dormitory project") for $14,671,714. Exhibit 5.

4. Metric also contracted with the GSA to construct Two Fully Baffled Outdoor Ranges in Artesia, New Mexico (the "Ranges" project).

5. Metric subcontracted portions of the Dormitory project to Belt Con, including selective demolition, precast architectural concrete, masonry, metal framing, building insulation, mineral fiber blanket insulation, roof and deck insulation, metal roof panels, built-up asphalt roofing, EPDM roofing, flashing and sheet metal, joint sealants, metal support assemblies, stucco, lath and plaster, gypsum drywall, acoustical ceilings, acoustical panel ceilings, painting and coatings, and finish schedule. Exhibit 1.

6. Belt Con performed no work relating to the Ranges project.

7. The Metric-Belt Con subcontract was for the amount of $3,094,000. Exhibit 1.

8. The subcontract included options to add $49,000. Exhibit 1.

9. Metric has paid $2,999,748.30 on the subcontract leaving a subcontract balance of $143,251.70 subject to offsets and counterclaims.

10. Belt Con agreed per Article 16 of the subcontract to clean up its work daily and remove all debris and rubbish from the jobsite as the work progressed. Exhibit 1.

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 2

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2945
(206) 770 3339

11. The Metric-Belt Con subcontract, at Art. 16, provided as follows:

> "If [Belt Con] fails to clean up daily or protect his own work or that of others, [Metric] shall have the right to perform such work and deduct all costs incurred from sums otherwise due [Belt Con]." Exhibit 1.

12. The Metric-Belt Con subcontract, at Art. 33(I), also specified that the subcontract includes "Clean-up and removal of all debris generated by the work of this Subcontract." Exhibit 1.

13. Belt Con failed to clean up its work and remove debris and rubbish from the site. The cost of clean-up was $11,193.47 as supported by the testimony of Mr. Pehrson and payroll time sheets (W/E 2/24/01, 3/3/01, 3/10/01, 3/17/01, 3/24/01, 3/31/01, 4/7/01, 4/14/01, 4/21/01, 4/28/01, 5/5/01, 5/12/01, 5/26/01, 6/1/01, 6/9/01, 6/16/01, 6/23/01, 6/30/01, 7/7/01, 7/21/01, 8/4/01, and 8/11/01). The cost of debris removal for Belt Con's debris was $11,226.41 as testified by Mr. Pehrson and indicated on Champion invoices 3603, 3587, 3609, 3613, and 3615 for $1,578.74, $2,982.06, $1,052.50, $3,683.73, and $1,929.58, respectively.

14. Metric also performed other work that Belt Con was responsible to perform including: (1) Removal of masonry block improperly placed and interfering with cast-in-place concrete beams for $2,758.22; (2) Tarping the roof leak at the Security Building for $22.65 (Labor W/E 11/25/00; (3) Rubbing down concrete as painting preparation and required by Specification Section 9900 that Metric directed Belt Con to perform and Belt Con refused to perform with costs set forth on Metric Purchase Order 06431 and Artesia Building invoice date 4/17/01, Metric Purchase Order 6432 and Artesia Building invoice dated 4/18/01, and labor in the amount of $6,395 as supported by the testimony of Mr. Pehrson and payroll time sheets (W/E 8/25/01, 9/1/01, 9/8/01, 9/22/01, and 9/29/01); (4) Cutting out block for a waste receptacle that Belt Con had

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 1100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1    incorrectly installed in the amount of $288.07 as supported by the testimony

2    of Mr. Pehrson and payroll time sheets (W/E 10/13/01); (5) Repairing an

3    irrigation line broken by Belt Con in the amount of $1,685.82 as supported by

4    the testimony of Mr. Pehrson and payroll time sheets (W/E 11/3/01, 11/10/01,

5    and 11/17/01); (6) Pipe identification as required by the specifications Section

6    9900 that Metric directed Belt Con to perform and Belt Con refused to perform

7    in the amount of $2,900 as supported by the testimony of Mr. Pehrson and

8    check no. 1293; and (7) Stucco repairs made after Belt Con had demobilized

9    from the project in the amount of $433.17 as supported by the testimony of

10    Mr. Pehrson and payroll time sheets (W/E 1/26/02 and 2/16/02).

11    15. Metric incurred costs associated with clean up, debris and rubbish removal,

12    and the other work as set forth above that Belt Con did not perform entitling

13    Metric to damages in the amount of $37,010.26 (Exhibit AQ) plus mark-up of

14    10%. See Articles 16 and 18 of Exhibit 1.

15    16. Certain work was deleted from Belt Con's subcontract. The two deductive

16    changes, PS17 and PS18, were sent to Belt Con for signature agreeing to

17    credits in the amounts of $7,523.18 and $3,472.46 respectfully. Belt Con

18    executed those agreements. Exhibits AO and AR. Belt Con does not dispute

19    these credits. Metric is entitled to an offset of the contract balance in the

20    amount of $10,995.64.

21    17. The specifications required Belt Con to provide roof warranties. These roof

22    warranties were to be provided regardless of whether there was a payment

23    dispute between Metric and Belt Con. The warranties go to the benefit of the

24    GSA. The GSA has requested Metric to provide the GSA with these roof

25    warranties. Metric has requested Belt Con to provide the roof warranties.

26    18. Specifications Section 07536.1.6, provided as follows:

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 4

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

> In no event shall the warranty period be less than 10 years from the date of the Government's acceptance of the work, notwithstanding roofing applicator's or manufacturer's unpaid invoices for installation, supplies, or service.

19. Belt Con has not provided Metric with the roof warranties as required by the contract and has refused to do so.

20. Metric attempted to procure warranties; however, Metric had difficulty finding a roofing contractor that would warrant another contractor's roof installation. Metric approached Prime Contractors, Belt Con's subcontractor, to obtain a quote for providing the warranties Belt Con had refused to provide.

21. Metric received a quote from Prime Contractors to provide the roof warranties in the amount of $118,000.

22. Mr. Miller testified that the $118,000 quote was reasonable and that Metric would not warrant the roof for that amount. Belt Con offered no evidence that the $118,000 was not reasonable. The $118,000 is the reasonable value of the roof warranties that Belt Con failed to provide to Metric and Metric is entitled to recover said sum from Belt Con.

23. The project had three separate phases. Each phase had its own liquidated damages if the contractor, Metric, failed to complete its work within the time specified in the contract. The three phases were: (1) Phase I for the Dormitories in the amount of $1,200/day; (2) Phase II for the Physical Training Building in the amount of $2,000/day; and (3) Phase III for the Security Building in the amount of $750/day.

24. The GSA assessed liquidated damages of $320,800 against Metric for late completion of the Dormitory project including $178,000 for 89 days of delay to the Physical Training Building at $2,000 per day and $142,800 for 119 days of

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 5

DANN & MEACHAM
ATTORNEYS AT LAW
2014 FAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1    delay for the Dormitories and Recreation Building at $1,200 per day. Exhibit

2    AK.

3    25. The GSA did not release the liquidated damages withheld on the Dormitory

4    project. Exhibit 4. The liquidated damages for the late completion of the

5    Dormitory project are actual damages incurred by Metric.

6    26. The Metric-Belt Con subcontract, at Art. 8, provided as follows:

7            If [Belt Con's] progress is delayed by the [GSA], [Metric],
         or another subcontractor, [Belt Con] shall be entitled to
8            an extension of time for the performance of the work
         covered by the Subcontract, but [Belt Con] shall not be
9            entitled to recover any damages or other compensation
         for such delays except to the extent that [Metric]
10           receives compensation from the [GSA] for delays
         caused by the [GSA]. If [Belt Con] delays progress of the
11           work, [Belt Con] shall be liable to [Metric] for a sum of
         money equal to the actual damages sustained by
12           [Metric]. If delays are caused by more than one
         subcontractor, [Metric] shall equitably allocate the
13           damages for delay among [Metric] and those
         subcontractors responsible for the delay and [Metric's]
14           decision as to the allocation shall be final and binding on
         all subcontractors as long as the decision is made in
15           good faith.

16    27. The Physical Training Building completed 89 days late. The GSA assessed

17    liquidated damages for the late completion of the Physical Training Building in

18    the amount of $178,000. Metric has allocated 33 of the 89 days of delay to

19    Belt Con.

20    28. After placement of the metal deck on the Physical Training Building roof, Belt

21    Con commenced installation of the drywall. The drywall work was initially

22    performed out of sequence; however, Belt Con commenced installing the roof

23    on March 8, 2001. The roof was to be installed in 10 days. Exhibit BM Pg 6.

24    29. The specifications anticipate that once the roof work begins there may be

25    materials and equipment below the roof that could be damaged by infiltrating

26    water. Specification Section 1500.1.3 required Belt Con to:

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 6

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770 3339

1          Take necessary precautions to ensure that roof openings
           and other critical openings in the building are monitored
2          carefully. Take immediate actions required to seal off
           such openings when rain or other detrimental weather is
3          imminent, and at the end of each workday. Ensure that
           the openings are completely sealed off to protect
4          materials and equipment in the building from damage.

5    30. Specification Section 07536.3.2.3.3, the EPDM roofing specification, required

6    Belt Con to:

7          Install temporary cutoffs and watertight seals around
           incomplete edges of roofing assembly at the end of each
8          day's work and when work must be postponed due to
           inclement weather. (Temporary cutoffs provide protection
9          against moisture infiltration and absorption.) Straighten
           insulation line using pieces of insulation loosely laid, and
10         seal EPDM sheet to deck. Remove temporary seals
           completely when work resumes. Provide temporary
11         ballast on roofing as necessary to prevent wind damage
           to EPDM.

12

13   31. On April 12, 2001, three weeks after the roof should have been complete and

14   five weeks after the roof installation had begun, rainwater entered the

15   Physical Training Building damaging the drywall and insulation.  This water

16   damage was caused by Belt Con's failure to install watertight seals and take

17   the necessary steps to ensure that the materials and equipment in the

18   building were protected as required by the specifications.

19   32. On April 19, 2001, the GSA ordered Metric to have Belt Con discontinue

20   installation of any new drywall until all damaged and unacceptable drywall

21   had been replaced. Exhibit Q. This order was passed through to Belt Con.

22   33. While removing the damaged and unacceptable drywall, it was discovered by

23   the GSA that Belt Con had allowed mortar droppings to build up between the

24   brick and the exterior sheeting blocking the masonry weep holes.  The

25   specifications required Belt Con to keep this space clear of mortar.

26

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 7

34. On May 4, 2001, Metric submitted a plan to correct the damaged drywall. Exhibit 37.

35. On May 14, 2001, the GSA threatened to terminate Metric's contract unless an acceptable plan was submitted by Metric to correct deficiencies that included repairing the damaged drywall and correcting the blocked weepholes and removing the extensive mortar droppings behind the sheetrock. Exhibit W.. The plan was submitted allowing Belt Con to proceed with the work on May 21, 2001. Exhibit 43.

36. Belt Con was required to remove the mortar droppings in areas as directed by the GSA. Belt Con was also required to drill new weep holes in other areas that the mortar had accumulated.

37. Belt Con admitted and does not dispute that the drywall replacement delayed the interior work on the Physical Training Building by 33 days. Exhibit 43 and Exhibit 107.

38. Belt Con argues that the GSA should not have stopped work on the drywall while a repair procedure was obtained and approved. The GSA's actions were reasonable under the circumstances. The delays caused by the damaged drywall were the direct result of Belt Con's breach of the contract by failing to properly protect the interior materials as required by the contract and by allowing mortar droppings between the brick and exterior sheeting.

39. The interior work including the installation of the drywall (Belt Con's work) was on the critical path. Mr. Pehrson testified that he reviewed the contemporaneous schedule updates and the drywall and interior work was on the critical path. Mr. Farley visited the job in May and July 2001 and testified that at the times he visited the job site it was his impression that the interior work was on the critical path. See also Exhibit BV page 23.

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770 3339

1    40. Mr. Farley rendered no opinion as to the Physical Training Building delays

2        and whether the interior or exterior was critical in his initial report. Exhibit 112.

3    41. At trial, Mr. Farley proffered schedules showing the baseline schedule with

4        revised start dates for the exterior work that indicated that the exterior of the

5        Physical Training Building was critical, but he acknowledged that it was his

6        observation that the interior work was more extensive than the exterior work

7        and stated that he would have expected the interior work to be on the critical

8        path.  Mr. Farely's opinion that the exterior was critical is not persuasive.  In

9        rendering his opinion, Mr. Farley presented a demonstrative schedule on

10       page 86; however, that schedule did not include any interior work activities

11       and did not evaluate the status of the interior of the Physical Training Building

12       at the time of delay.

13   42. Of the 89 days of delay to the Physical Training Building for which the GSA

14       assessed liquidated damages against Metric, Belt Con caused 33 days of

15       delay for which the GSA withheld $66,000 in liquidated damages from

16       Metric's contract.  The GSA has not released those liquidated damages and

17       maintains those liquidated damages were rightfully withheld.  Exhibit 4.

18       Metric's allocation of 33 days of delay to the Physical Training Building is

19       made in good faith pursuant to Article 8 of the subcontract.

20   43. There are two dormitories on the project that were to be constructed by

21       Metric: the Northeast dormitory (Building 21) and the Southwest dormitory

22       (Building 19). Prior to the construction of the Dormitories, Belt Con and Metric

23       agreed upon a schedule whereby Metric's concrete subcontractor, R&R,

24       would complete the slab on grade on Building 21 and then Belt Con would

25       have five weeks to install the first floor masonry on Building 21.  While Belt

26       Con was installing the masonry on the first floor of Building 21, R&R was to

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770 3339

1   complete the slab on grade for Building 19. After Building 21 first floor

2   masonry was complete, Belt Con was to move to Building 19 and would then

3   have five weeks to complete the masonry on the first floor of Building 19.

4   During the five weeks Belt Con was installing the masonry on the first floor of

5   Building 19, R&R was to install the concrete "lid" (including the cast in place

6   raised walkways, the cast in place chase floor and the concrete topping over

7   precast hollow core planks) above the first floor masonry on Building 19 which

8   would then allow for Belt Con to proceed with the masonry on the second

9   floor of Building 21. This five week alternating schedule of masonry and

10  concrete work was scheduled to continue up all three floors of the

11  dormitories.

12  44. Of the 89 days of delay to the Physical Training Building for which the GSA

13      assessed liquidated damages against Metric, Belt Con caused 33 days of

14      delay for which the GSA withheld $66,000 in liquidated damages from

15      Metric's contract. The GSA has not released those liquidated damages and

16      maintains those liquidated damages were rightfully withheld. Exhibit 4.

17      Metric's allocation of 33 days of delay to the Physical Training Building is

18      made in good faith pursuant to Article 8 of the subcontract.

19  45. In lieu of Belt Con taking five weeks to install its masonry work on each floor

20      of each dormitory, Belt Con took 9 to 11 weeks to install its masonry on each

21      floor delaying completion of the Dormitory Phase of the project.

22  46. The masonry and concrete work for the Dormitories was on the critical path

23      and was to be followed by the interior finish work. The masonry and concrete

24      structure work completed late. The late completion of the masonry and

25      concrete structure delayed completion of the Dormitory phase of the project.

26

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 10

**DANN & MEACHAM**
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

47. In support of their respective positions, both parties retained experts to opine as to the cause and extent of the delay.  Both experts agreed that the masonry and concrete work for the Dormitories was on the critical path on the baseline schedule.  Both experts agreed that the masonry and concrete remained on the critical path for several months after the masonry and concrete work started on the dormitories.  Mr. Farley opined that in mid-March or early April 2001 the concrete/masonry structure work fell off the critical path and was replaced by interior finish work.  Mr. Farley presented no schedule or credible evidence supporting this position.  Mr. Quick opined that the masonry/concrete work remained on the critical path until after the masonry work (except for corrective work) was completed and that either the concrete or the masonry work drove the schedule until the masonry was completed on April 9, 2001.  Mr. Quick's analysis evaluated the interior activities and determined that those activities had float and did not become critical until after the masonry work was complete.  Mr. Quick's analysis is consistent with the baseline schedule and the scheduled sequence of construction.  Mr. Quick's analysis is persuasive and the Court finds that the masonry/concrete work remained critical through April 9, 2001 when Building 19 third floor masonry was completed and thereafter allowed the roof concrete and third floor interior activities to proceed.

48. Mr. Farley's analysis indicated that the first floor masonry on Building 21 was critical and completed two days late, June 15 versus the scheduled completion date of June 13, 2000.  Metric presented evidence that Building 21 first floor masonry did not complete until June 28, 2000.  Mr. Quick testified that he reviewed daily reports indicating work continuing through June 28, 2000.  Mr. Pehrson testified regarding a letter he faxed to Belt Con

DANN & MEACHAM
ATTORNEYS AT LAW
2014 FAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1  on June 26, 2000 regarding the need of Belt Con to have its work inspected

2  for Building 21 first floor.  Mr. Beltran testified that this inspection occurred

3  shortly thereafter.  This allowed Metric to proceed with the Building 21 first

4  floor lid which then became the critical work.  The Court finds Mr. Quick's

5  testimony and the evidence persuasive that Belt Con's late completion of the

6  Building 21 first floor masonry delayed the project by 15 days from June 13th

7  to June 28th rather than two days as opined by Mr. Farley.

8  49. After completion of the Building 21 first floor masonry, Mr. Farley opined that

9  the Building 19 concrete and masonry work then became critical and drove

10  the project completion.  The Court finds Mr. Farley's opinion unpersuasive

11  and erroneous for the following reasons: (1) In formulating his opinion, Mr.

12  Farley released the schedule logic that showed the alternating floor

13  sequence.  This created 25 days of float (which conflicted with the baseline

14  schedule FL00) in the Building 21 concrete and masonry activities.  This

15  change in logic with 25 days of float allowed the Building 21 and Building 19

16  concrete activities and masonry activities to be performed concurrently i.e.

17  Building 21 masonry being performed the same time as the Building 19

18  masonry, rather than the as planned alternating sequence; (2) Mr. Farley

19  revised his AB series schedules with updated information but the updated

20  information was not inserted in the schedules included in Exhibit 114 that

21  formed the basis of his testimony; (3) Some of the AB schedules prepared by

22  Mr. Farley used "actual" dates that were artificially inserted after the

23  schedule's "data date".  Mr. Farley acknowledged that this was not a proper

24  scheduling technique; and (4) Mr. Farley used daily reports in establishing

25  dates that conflicted with the more specific concrete pour information

26  contained in the concrete pour reports.

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770 3339

50. In addition to the two days of masonry delay related to Building 21 first floor masonry and shifting the entire critical path to Building 19, Mr. Farley determined that the masonry caused 8 days of delay in completing Building 19 second floor masonry. Exhibit 114, pg. 36.  He also opined that Building 19 third floor masonry contributed an additional 25 days of delay. Exhibit 114, pgs. 41 and 42. The total masonry delay acknowledged by Mr. Farley is 35 days.

51. On the other hand, Mr. Quick performed a delay analysis of the dormitory critical path and opined that Belt Con caused 88 days of delay. The Court finds Mr. Quick's analysis to be more persuasive for the following reasons: (1) Mr. Quick's dates relied upon more accurate data in considering the daily reports and the contemporaneous concrete pour reports; (2) Mr. Quick's analysis in more consistent with the contemporaneous project records in evidence.  Mr. Quick's analysis of Building 21 first floor masonry delays as set forth above is consistent with the daily reports and Exhibit C in establishing a June 28 completion date resulting in 15 days of delay.  Mr. Quick then opined that Building 21 concrete delayed the project by an additional 8 days which is consistent with Exhibit D and the testimony regarding problems with the precast panels because of mislocated rebar that had to be readjusted to allow the panels to be placed and the masonry block that conflicted with the concrete beams that had to be cast.  Mr. Quick further opined that Building 21 second floor masonry delayed the project by an additional 37 days when the masonry started on August 1 and continued through October 17, 2000, a total of 11 weeks.  Mr. Quick's opinion is consistent with Exhibit F and Mr. Miller's testimony that was subsequently confirmed in Mr. Beltran's testimony that he visited the jobsite which Building 21 second floor masonry was being installed

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1   and told Mr. Beltran that Belt Con "is killing us", and Mr. Beltran replied that

2   Belt Con was having a difficult time getting masons to come to Artesia from El

3   Paso.  Mr. Quick further opined that after the Building 21 masonry delays, the

4   concrete then delayed the dormitories by an additional 30 days when the

5   concrete lid did not complete until December 20, 2000.  This is also

6   consistent with Exhibit 18, 19, 20, 21, 24, 26 and 117 and the testimony that

7   in November/December 2000 R&R was delaying the project.  Prior to this

8   correspondence in November and December for the concrete delays in the

9   November and December 2000 time frame, there was no other documented

10   evidence that R&R was delaying either Belt Con or the dormitory structural

11   work.  The only documented evidence throughout the entire construction of

12   concrete/masonry structure from Belt Con that R&R was delaying its work

13   was its letter of January 4, 2001 (Exhibit 27) and that is shortly after Building

14   21 concrete lid turned over to Belt Con to install the third floor masonry i.e.

15   the period that Mr. Quick recognized as being an R&R delay.  After the

16   Building 21 concrete lid was turned over to Belt Con on December 20, 2000,

17   Mr. Quick then opined that Building 21 third floor masonry and Building 19

18   third floor masonry delayed project completion by 12 and 24 days,

19   respectively.  Again, this is supported by the contemporaneous documents

20   and testimony.  Mr. Pehrson faxed a letter to Belt Con on February 6th

21   complaining that Belt Con's masonry progress is "total unsatisfactory." Exhibit

22   I.  Mr. Pehrson wrote a letter to Belt Con's surety on March 1, 2001

23   complaining about the masonry work dragging weeks behind. Exhibit J.  Mr.

24   Pehrson again faxed Belt Con on March 2, 2001 that more masons were

25   needed on the dormitories.  Exhibit L.  Mr. Pehrson follows up with a letter of

26   March 16th stating that they have seen very little improvement to the masonry.

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1    Exhibit N.  The evidence presented was that Belt Con had partial access to

2    Building 21 third floor masonry on December 1 and full access on December

3    20, 2000; however, even with full access after December 20th, the masonry

4    did not complete until February 5, 2001, almost 7 weeks later.  Belt Con

5    received full access to Building 19 third floor masonry on February fifth and

6    did not complete until April 9, 2001, over 9 weeks later.  Both of these

7    activities were on the critical path and were scheduled to take five weeks

8    each.  In addition, these masonry activities had no successor masonry

9    activities.  In other words, once this work was complete there was no other

10   masonry work to perform.  The masonry was not waiting for any preceding

11   work, but still took weeks longer than scheduled.  When asked on cross

12   examination why the third floor masonry took so long, Mr. Beltran responded,

13   "I don't know."  After Belt Con's letter of January 4th through completion of the

14   masonry on April 9th there is no documentary evidence that either Metric or

15   Belt Con complained about R&R's performance on the dormitory structure.

16   The Court finds Mr. Quick and the supporting evidence persuasive that Belt

17   Con delayed completion of the dormitory phase of the project by 88 days.

18   52. Metric's allocation of 88 days of delay to the Dormitories is made in good

19       faith pursuant to Article 8 of the subcontract.

20   53. As a result of Belt Con's 88 days of delay to the Dormitories, the GSA

21       withheld liquidated damages from Metric at a rate of $1,200/day for a total

22       amount of $105,600.  The GSA did not release these liquidated damages and

23       Metric has sustained actual damages in the amount of $105,600 as a result of

24       Belt Con's 88 day delay in completing its masonry work on the Dormitories.

25

26

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

54. Belt Con has presented no evidence that the GSA has actually released any of the liquidated damages it withheld from Metric for the late completion of the Physical training Building or the Dormitory phase of the project.

55. The average daily rate incurred by Metric as a result of Metric's extended duration on the project is $1,652.04 ($1,669.39 less the bond cost) per day for its field office overhead and general conditions on the project.   Metric calculated this rate over an extended period of time to determine a reasonable average.  This daily rate is a reasonable rate for extended site overhead.   The extended duration damages for 88 days at $1,652.04 is $145,379.52.  Whereas, the critical concrete/masonry work completed 126 days late and the successor work and dormitory phase only completed 119 days late i.e. the work after the structure was complete was accelerated by 7 days; the delay costs incurred by Metric would not have been incurred had Belt Con completed its masonry work in a timely manner.

56. In addition to the contract balance of $143,251.70, Belt Con has requested additional compensation in the amounts as follows: (1) $147,002 for "Inefficiencies and Out of Sequence Work"; (2) $30,572 for "Additional Equipment Costs"; (3) $15,896 for "Additional Supervision"; (4) $16,689 for "Housing"; (5) $17,482 for interest based on underbilling; (6) $26,159 for interest on late payments; and (7) $20,860 for interest on the claims.

57. The Metric-Belt Con subcontract, at Art. 19, provided as follows:

> In the event [Belt Con] seeks an adjustment to the contract time or amount for changes to the contract including changes in the scope of work, extra work, delays to contract performance, impact damages associated with either changed work or contract work, [Belt Con] will notify [Metric] in writing, via facsimile and certified return receipt letter to [Metric's] office in Thousand Oaks, California and clearly state the basis for [Belt Con's] alleged adjustment. This written notice must be given within 48 hours of encountering the condition or

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1
2
3

incurring costs relating to the alleged adjustment. [Belt Con] hereby agrees that failure to give written notice as set forth herein shall constitute a waiver of all [Belt Con] claims for damages or an adjustment to the contract.

58. Belt Con failed to give notice pursuant to Article 19 for the alleged damages for the masonry work, relating to Inefficiencies and Out of Sequence Work in the amount of $147,002.

59. Belt Con failed to give notice pursuant to Article 19 for the alleged damages for the masonry work, relating to Additional Equipment Costs in the amount of $30,572.

60. Belt Con failed to give notice pursuant to Article 19 for the alleged damages for the masonry work, relating to Additional Supervision in the amount of $15,896.

61. Belt Con failed to give notice pursuant to Article 19 for the alleged damages for the masonry work, relating to Housing in the amount of $16,689.

62. The only written notice that its work was being delayed or impacted throughout the entire period during which the masonry was being installed from March 2000 through April 9, 2001 was a single letter dated January 4, 2001. Exhibit 27.  This notice was given after the masonry was complete on the first and second floors of both Buildings 19 and 21.

63. Subsequent to its letter of January 4, 2001, Belt Con had full access to Building 21 third floor masonry and then full access to Building 19 third floor masonry without any overlap of the concrete work.  With full access to each floor, Belt Con had no inefficiencies or out of sequence work after January 4, 2001.

64. The Metric-Belt Con subcontract, at Art. 8, provides as follows:

If [Belt Con's] progress is delayed by the [GSA], [Metric], or another subcontractor, [Belt Con] shall be entitled to an extension of time for the performance of the work

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1  covered by the Subcontract, but [Belt Con] shall not be
2  entitled to recover any damages or other compensation
   for such delays except to the extent that [Metric] receives
3  compensation from the [GSA] for delays caused by the
   [GSA].

4  65. Metric did not recover any moneys from the GSA for delays caused by the
5  GSA.

6  66. Belt Con did not perform its work out of sequence.  It performed its work in
7  the sequence as set forth in the project schedule and as discussed in the
8  initial planning stages i.e. starting with Building 21 first floor masonry, then
9  moving to Building 19 first floor masonry, then moving to Building 21 second
10  floor masonry, etc.

11  67. To the extent Belt Con's work was less efficient because it allegedly
12  overlapped with the concrete, the overlap was caused by either Belt Con's
13  late performance or by delays to completion of the concrete work.  These
14  delays to the concrete work are the specific delays for which the contract
15  precludes Belt Con from seeking damages under Article 8 of the subcontract.

16  68. In calculating its damages for "inefficiencies and out of sequence work," Belt
17  Con used a "measured mile" that by Mr. Farley's testimony was during a
18  period that was an "arbitrary selection."  The period selected by Mr. Farley
19  was from September 19, 2000 through October 19, 2000.  However, Belt Con
20  had uninterrupted work with complete access on Building 19 through the end
21  of November 2000. From October 20th through November 29th, Belt Con had
22  daily unit production costs of $5.52, $5.81, $5.71, $5.82, $5.32, $5.18, $5.89,
23  $5.42, $6.45, $22.53, $36.91, $36.83, $6.54, $4.65, and $4.96. Exhibit CA.  A
24  simple calculation of the unit production rates from September 19th through
25  November 29th yields a unit rate of $4.56/unit, significantly higher than the
26  arbitrarily selected period between September 19th and October 19th and the

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770 3339

1    rate of $3.69 calculated by Mr. Farley.  Mr. Farley's calculation is speculative

2    in nature and shows no casual link between the concrete delays alleged by

3    Belt Con and the arbitrarily selected measured mile period.

4    69. From Mr. Farley's "arbitrarily selected" data, he calculates an additional 72

5    days of forklift time and mortar mixers based solely on his measured mile

6    calculation.  The costs of equipment are also delay costs and are unreliable

7    since they use the speculative measured mile analysis and have no causal

8    link to any actual delay periods caused by placement of the concrete or any

9    overlap of the concrete and masonry.

10   70. The other equipment costs, supervision costs, and housing costs are strictly

11   delay costs not recoverable under the subcontract.  Mr. Farley did not review

12   any actual invoices to determine the accuracy of the supervision and housing

13   costs, but relied solely on the representations of Belt Con.

14   71. Article 5 of the Subcontract states, "Contractor agrees to pay Subcontractor in

15   monthly payments of 90% of labor and materials which have been placed in

16   position and for which payment has been made by Owner to Contractor."

17   72. Belt Con's Underbilling claim included incorrect information supplied by Belt

18   Con to Mr. Farley.  It included incorrect amounts listed as "Belt Con's Invoice

19   Amount."  It included unsubstantiated numbers for "Total Complete & Stored."

20   Some numbers in the "Shortfall" column were miscalculated, in particular for

21   payment application numbers 11, 12, and 13.  Belt Con provided no evidence

22   as to the amounts actually billed to the GSA or paid by the GSA for which it

23   alleged its claim against Metric.  The uncontroverted evidence was that Metric

24   properly paid the subcontractors in a timely manner based upon the amounts

25   Metric actually received from the GSA.  Belt Con has presented no credible

26

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2765
(206) 770-3339

1     evidence that Metric did not properly and promptly pay Belt Con those

2     amounts Metric had actually been paid by the GSA for Belt Con's work.

3   73. Belt Con's claim for interest on late payments represented that payments for

4     Metric pay applications 2, 3, 4, 5, 6, and 7 were due on 5/17/00, 6/5/00,

5     7/13/00, 8/17/00, 9/25/00, and 10/13/00.  Belt Con claimed that the actual

6     dates were 5/24/00, 7/14/00, 7/21/00 and 8/4/00, 8/18/00 and 9/13/00,

7     9/29/00 and 10/30/00.  The evidence presented at trial was that the invoices

8     had been paid promptly.  Mr. Farley had relied upon the actual dates provided

9     by Belt Con rather than the actual checks that had been issued much earlier

10    and in most cases, prior to the due date.

11  74. Belt Con's claim for interest on late payments also included Metric pay

12    applications 18, 19, and 21.  The subcontract required Belt Con to furnish

13    releases from its subcontractors.  Belt Con had failed to include releases from

14    its subcontractor Prime Contractors.  Belt Con had failed to even list Prime

15    Contractors as a subcontractor until its Payment Affidavit and Release

16    submitted October 19, 2001.  Exhibit BR.  Upon receipt of the proper

17    releases, Metric made prompt payment to Belt Con.  Belt Con presented no

18    credible evidence that Metric failed to make timely payments.

19  75. Belt Con makes general allegations that Metric had "an adversarial

20    relationship" with the GSA, that Metric failed to properly update the schedule,

21    that Metric failed to provide Belt Con with schedules, that Metric failed to

22    make timely payments to Belt Con and other subcontractors resulting in Belt

23    Con and R&R walking off the job, and that R&R Concrete failed to adequately

24    perform its work and "abandoned" the job.

25  76. Although Metric acknowledges that it did not have the best relationship with

26    the GSA, the evidence presented was that Belt Con contributed to the

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 20

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770 3339

1   adversarial relationship by not timely procuring brick that the GSA attempted

2   to accelerate, attempting to install unapproved roofing materials, failing to

3   maintain its schedule, allowing mortar between the brick and exterior sheeting

4   in the Physical Training Building in conflict with the specifications, failing to

5   protect its work, and poor workmanship on the masonry.  Regardless of the

6   relationship between Metric and the GSA, Belt Con has provided no credible

7   evidence that the "adversarial relationship" actually contributed to any delays

8   or disruption on the project for which either party is seeking damages.

9   77. Although Belt Con now claims that Metric failed to properly update the

10   schedule and failed to provide Belt Con with updated schedules.  The

11   evidence at trial was that Metric held either weekly or daily scheduling

12   meetings throughout the entire duration of the project, that Metric had the

13   baseline schedule in the office for the subcontractor's use and to monitor their

14   progress, that Metric maintained the baseline logic and durations allocated to

15   the subcontractors to perform their work, that Metric did in fact provide Belt

16   Con with a copy of the recovery schedule showing the revised completion

17   dates (Exhibit 43), that Metric told Belt Con when it had to finish each activity,

18   and that Belt Con **never** complained about not knowing what work it was to

19   perform at a particular point in time, not knowing when its work needed to be

20   complete, or not having either an update or a revised schedule until after Mr.

21   Farley visited the jobsite on May 9, 2000, a month after the masonry was

22   complete.

23   78. Belt Con's claims that Metric failed to pay Belt Con and Metric's other

24   subcontractors in a timely manner or in the proper amount is unsupported by

25   the evidence presented at trial.  Belt Con presented no credible evidence that

26   Metric had received a payment from the GSA and failed to make a payment

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 21

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1    to the subcontractors in either a timely manner or in an amount less than what

2    the GSA had paid Metric after making its deductions.

3  79. Belt Con's allegations regarding R&R's inadequacies are not supported by

4    the evidence. The evidence supports Metric's position that R&R did not delay

5    Belt Con's work and adequately performed except for the isolated time frame

6    in November/December 2000 when R&R shifted manpower to the Physical

7    Training Building.  Metric took over R&R's payroll in July 2001 when R&R ran

8    into financial difficulty; however, this was five months after it turned the final

9    dormitory concrete lid over to Belt Con for installation of the masonry.  R&R

10    did not "abandon" the job, but continued to supervise and administer its

11    subcontract.

12

13              **III. CONCLUSIONS OF LAW**

14  1.  This is an action brought pursuant to the Miller Act, 40 U.S.C. Sections 3131-

15    3133.  Jurisdiction over this matter exists by virtue of the provisions of the

16    Miller Act, as well as 28 U.S.C. Sections 1331, 1345, and 1352.

17  2.  Venue is properly laid in this District pursuant to the Miller Act and 28 U.S.C.

18    Section 1391(b)(2).

19  3.  Articles 16 and 33(i) of the subcontract required Belt Con to clean-up its work

20    areas on a daily basis and remove the debris.  If Belt Con failed the perform

21    this work, the subcontract allowed Metric to perform the work and deduct the

22    costs from sums otherwise due Belt Con.  Belt Con failed to clean-up its

23    work and haul away its debris. Metric performed that work at a labor cost of

24    $11,193.47 and a hauling cost of $11,226.41; therefore, Metric is entitled to

25    recover $22,419.88 for these costs plus a 10% fee for supervision and

26

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 22

**DANN & MEACHAM**
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3039

1    coordination per Article 18 for a total amount of $24,661.87.  These damages

2    have been proved by a preponderance of the evidence.

3    4.  Metric also performed other work for Belt Con that Belt Con was required to

4        do under its subcontract with Metric including: removing improperly placed

5        block, tarping roof leaks at the Security Building, rubbing down concrete

6        pursuant to the painting specifications, cutting out improperly placed block

7        for a waste receptacle, repairing an irrigation line broken by Belt Con,

8        painting pipe identification on the piping as required by the painting

9        specifications, and making stucco repairs.  The total cost for this work is

10       $14,590.38; therefore, Metric is entitled to recover $14,590.38 for these

11       costs plus a 10% fee for supervision and coordination per Article 18 for a

12       total amount of $16,049.42.  These damages have been proved by a

13       preponderance of the evidence.

14   5.  Work was deleted from the Metric/Belt Con subcontract for PS 17 and PS

15       18.  The value of that work is $10,995.64.  Metric is entitled to an adjustment

16       to the contract entitling Metric to payment of $10,995.64 from Belt Con.  This

17       reduction in the contract amount as a result of the deductive changes has

18       been proved by a preponderance of the evidence.

19   6.  The subcontract required Belt Con to provide Metric with roof warranties for

20       the multiple buildings on the project.  Belt Con refused to provide the roof

21       warranties.  Metric remains liable to the GSA for any warranty items that may

22       arise relating to the roof.  Metric obtained a quotation for the roof warranty in

23       the amount of $118,000.  This amount is reasonable. Metric is entitled to

24       damages resulting from Belt Con's breach in failing to provide the roof

25       warranties in the amount of $118,000.  Metric damages for Belt Con's failure

26

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770 3339

1    to provide the roof warranties has been proved by a preponderance of the

2    evidence.

3    7.   Belt Con delayed completion of the Physical Training Building by 33 days.

4        Metric's allocation of 33 of the 89 days of delay was made in good faith by

5        Metric.  As a result of that delay, the GSA withheld liquidated damages in the

6        amount of $66,000 from Metric's contract.  The $66,000 has not been paid

7        by the GSA to Metric.  Metric has been damaged in the amount of $66,000

8        as a result of Belt Con's delays to the Physical Training Building.  Metric is

9        entitled to recover $66,000 from Belt Con as a result of Belt Con's delays to

10       the Physical Training Building.  Metric's damages for Belt Con's delay to the

11       Physical Training Building have been proved by a preponderance of the

12       evidence.

13   8.   Belt Con delayed completion of the Dormitory phase of the project by 88

14       days.  Metric's allocation of 88 of the 126 days of delay was made in good

15       faith by Metric.  As a result of that delay, the GSA withheld liquidated

16       damages in the amount of $105,600 from Metric's contract.  The $105,600

17       has not been paid by the GSA to Metric.  Metric has been damaged in the

18       amount of $105,600 as a result of Belt Con's delays to the Dormitories.

19       Metric is entitled to recover $105,600 from Belt Con as a result of Belt Con's

20       delays to the Dormitories.  These damages have been proved by a

21       preponderance of the evidence.

22   9.   In addition to the damages Metric incurred by the GSA's withholding of

23       liquidated damages on the Dormitories, the late completion of the

24       Dormitories resulted in Metric being on the project for an extended duration

25       of time.  Metric incurred damages resulting from being on the project for an

26       extended duration corresponding with the 88 days of delay to the

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1          Dormitories.  Metric damages for this extended duration is reasonably

2          calculated at $1,652.04.  Metric is entitled to an additional $145,379.52 in

3          damages resulting from Belt Con's late completion of the Dormitories.  These

4          delay damages have been proved by a preponderance of the evidence.

5     10. Belt Con has requested $147,002 for Masonry inefficiencies and out of

6          sequence work.  Belt Con failed to provide notice of this claim in accordance

7          with Article 19 of the subcontract.  Notice provision are enforceable and Belt

8          Con failed to comply with notice requirements of its contract and thereby

9          waived its right to make claim against Metric for the masonry inefficiencies

10          and out of sequence work prior to January 4, 2001.  The damages for which

11          Belt Con seeks compensation are delay damages, which are precluded

12          under Article 8 of the subcontract.  No damage for delay clauses such as the

13          one set forth in the Metric subcontract are enforceable.  Belt Con cannot

14          attempt to avoid this clause by phrasing its claim as an inefficiency or out of

15          sequence claim.  Any alleged inefficiencies or out of sequence work was

16          due, if at all, to the delayed completion of the concrete work.   These are

17          delay damages not recoverable by Belt Con and the Court will not set Article

18          8 of the subcontract aside.  In addition, the measured mile analysis based on

19          an arbitrary selection of dates is not representative of an entire

20          unencumbered production area and the Court deems the calculation

21          speculative and does not reasonably represent the damages Belt Con

22          incurred by the alleged out of sequence work it performed.  Belt Con's

23          request for damages in the amount of $147,002 is denied.

24     11. Belt Con's request for damages relating to additional equipment costs,

25          additional supervision, and housing in the amounts of $30,572, $15,896, and

26

**DANN & MEACHAM**
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1   $16,689, respectively are also denied for the same reasoning as set forth

2   above.

3   12. Belt Con's claim for interest related to the masonry claim are also denied for

4   the additional reason that those claims are unliquidated. Prejudgment

5   interest is only allowable on liquidated claims.

6   13. Belt Con has failed to prove by a preponderance of the evidence that Metric

7   failed to make timely payments pursuant to the Prompt Payment Act or that

8   Metric failed to properly pay Belt Con the amounts due under the

9   subcontract. Belt Con's claims for underbilling and late payment are denied.

10  14. Based upon the Findings of Fact and these Conclusions of Law, damages

11  and interest are to be awarded as follows:

| | |
|---|---|
| Contract Balance | $143,251.70 |
| Credit for Clean-up and Other Work | (40,711.29) |
| Credit for PS17 and PS 18 | (10,995.64) |
| Credit for Roof Warranty | (118,000.00) |
| Credit for Physical Training LDs | (66,000.00) |
| Credit for Dormitories LDs | (105,600.00) |
| Credit for Extended Overhead Costs | (145,379.52) |
| Subtotal | (343,434.75) |
| Interest 2/11/02 (Date LDs Assessed)-11/15/04 | (94,844.47) |
| Total | (438,279.22) |

The total amount due Metric from Belt Con is $438,279.22 through

November 15, 2004, plus attorney fees and costs.

15. Metric is the prevailing party as set forth and defined under Article 21 of the

subcontract. Metric is entitled to an award of reasonable attorney fees and

costs. The amount to be established upon application by Metric in

accordance with the rules of this Court.

METRIC'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW – Page 26

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

1

2        DATED this _____ day of November, 2004.

3

4

5

6                            THE HONORABLE JAMES BROWNING
                              UNITED STATES DISTRICT JUDGE

7                            DISTRICT OF NEW MEXICO

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DANN & MEACHAM
ATTORNEYS AT LAW
2014 EAST MADISON STREET, SUITE 100
SEATTLE, WASHINGTON 98122-2965
(206) 770-3339

0694 068 fk110702