# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, for the use of
BELT CON CONSTRUCTION, INC.,

        Plaintiff,

vs.                                             No. CIV 02 1398 JB/LAM

METRIC CONSTRUCTION CO., INC. and
SAFECO INSURANCE COMPANY OF
AMERICA,

        Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** comes before the Court on Use Plaintiff Belt Con's Request by Use Plaintiff for Findings of Fact and Conclusions of Law, filed November 15, 2004 (Doc. 100), Belt Con's Trial Brief, filed November 15, 2004 (Doc. 101), Belt Con's Supplemental Trial Brief, filed November 18, 2004 (Doc. 104), Defendant Metric's Trial Brief, filed October 29, 2004 (Doc. 97), Metric's Supplemental Brief, filed November 15, 2004 (Doc. 102), and Metric's Findings of Fact and Conclusions of Law, filed November 15, 2004 (Doc. 103). The Court held a bench trial on November 1, 2, 3, and 4, 2004. After hearing witness testimony and considering all the evidence presented in this matter, and pursuant to rule 53(a) of the Federal Rules of Civil Procedure, the Court makes the following Findings of Fact and Conclusions of Law.

## STIPULATED FACTS

The parties, through counsel, have stipulated to the following facts:

1.      Metric entered into a contract with the United States of America to perform labor and furnish materials for the construction of dormitories and physical training and security buildings at

the FLETC[1] campus in Artesia, New Mexico, being contract # GS-07P-99-UHC-0018, for a contract price of $14,671,714.00. Alternate/Option 1, 2, 3, and 4 were added to the contract which increased the value to $15,397,050.00.

2.      Metric, as principal, and Safeco, as surety, executed and delivered to the United States their bond, conditioned as required by the Miller Act, for the protection of all persons supplying labor and materials in the prosecution of the work provided for in the contract.

3.      On or about January 28, 2000, Belt Con entered into a subcontract with Metric whereby Belt Con agreed to furnish certain labor and materials required for the construction project under contract # GS-07P-99-UHC-0018, for a contract price of $3,094,000.00.   The adjusted contract price was $3,143,000.00.

4.      The Physical Training ("PT") Building contractual completion date was June 13, 2001. The substantial completion date for the PT Building was September 10, 2001.  Metric was 89 days late in completing the PT Building.

5.      The dormitories and recreation building contractual completion date was July 18, 2001.  Substantial completion date was November 14, 2001.  Metric was 119 calendar days late in completing the Dormitory Buildings.

6.      The balance due on Belt Con's subcontract, not considering Metric's counterclaim, is $143,251.70.

7.      Metric has not paid the balance of its subcontract price.

8.      Metric filed claims against the government for the release of all liquidated damages including the $171,600.00 claimed against Belt Con.

---

[1] Federal Law Enforcement Training Center.

9.      Metric settled all of its claims against the government including its claim for the release of liquidated damages for the sum of $662,500.00.

10.     R&R Concrete was a subcontractor on the project under Metric for the concrete work.

## COURT'S FINDINGS OF FACT

### 1.      The Subcontract

11.     Metric drafted the subcontract between Metric and Belt Con.  See Transcript of Trial at 17:22-23 (November 1, 2004)(testimony of Raymundo Beltran, President of Belt Con Construction)(hereinafter "Transcript").[2]

12.     Under the subcontract, Belt Con was to provide masonry work.  See id. at 16:21 - 17:21 (November 1, 2004)( Beltran).

13.     Article 5 of the subcontract provides: "Contractor agrees to pay Subcontractor in monthly payments of 90% of labor and materials which have been placed in position and for which payment has been made by Owner to Contractor."

14.     Article 8 of the subcontract provides:

> If [Belt Con's] progress is delayed by the [GSA], [Metric], or another
> subcontractor, [Belt Con] shall be entitled to an extension of time for the
> performance of the work covered by the Subcontract, but [Belt Con] shall not
> be entitled to recover any damages or other compensation for such delays
> except to the extent that [Metric] receives compensation from the [GSA] for
> delays caused by the [GSA]. If [Belt Con] delays progress of the work, [Belt
> Con] shall be liable to [Metric] for a sum of money equal to the actual
> damages sustained by [Metric]. If delays are caused by more than one
> subcontractor, [Metric] shall equitably allocate the damages for delay among
> [Metric] and those subcontractors responsible for the delay and [Metric's]

---

[2]  The Court's citations to the transcript of the trial refer to the Court Reporters' original, unedited versions.  Any finalized transcript will contain slightly different page and/or line numbers.

decision as to the allocation shall be final and binding on all subcontractors as long as the decision is made in good faith.

15.   Article 16 of the subcontract provides:

Clean Up, Protection, and Storage  Subcontractor agrees to clean up his work daily and remove all debris, rubbish, and surplus materials from the job site as the work progresses and as directed by the Contractor.  Subcontractor shall protect all other parts of the work from damage by the work of Subcontractor, and protect his own work from damage until final acceptance. If Subcontractor fails to clean up daily or protect his own work or that of others, Contractor shall have the right to perform such work and deduct all costs incurred from sums otherwise due Subcontractor.   Materials of Subcontractor may be stored on the job site as approved by Contractor, but proper protection of such materials shall be the sole responsibility of the Subcontractor.  On-site storage of materials shall be at the expense and risk (if any) of the Subcontractor.

16.   Article 18 of the subcontract provides:

If in the opinion of Contractor, Owner or Architect, Subcontractor fails in any material respect to comply with the requirements of the Contract documents, or this Subcontract, Contractor shall give Subcontractor written notice thereof.  Subcontractor shall have 48 hours after receipt of such written notice to cure the default.  If in the opinion of the Contractor, Owner, or Architect, Subcontractor fails to cure the default within the 48 hour period, then Contractor by further written notice may terminate Subcontractor's right to proceed with the work, and eject Subcontractor from the job.  In that event, Subcontractor shall peaceably depart from the site of the project, and shall leave in possession of Contractor all materials, inventory, tools, equipment and appliances assembled at the job site by Subcontractor for prosecution of the work.   Contractor will complete Subcontractor's portion of the work using its own forces or other subcontractors.  The total costs incurred by the Contractor in performing Subcontractor's portion of the work, plus a ten percent fee for supervision and coordination, shall be computed and the amount thereof added to the sums previously paid to or for the account of the Subcontractor.  If the total is more than the Subcontract price, Subcontractor and its surety shall reimburse Contractor for the difference; if the total is less than the Subcontract price, Contractor shall pay Subcontractor the difference.

17.   Article 19 of the subcontract provides:

In the event [Belt Con] seeks an adjustment to the contract time or amount

-4-

for changes to the contract including changes in the scope of work, extra work, delays to contract performance, impact damages associated with either changed work or contract work, [Belt Con] will notify [Metric] in writing, via facsimile and certified return receipt letter to [Metric's] office in Thousand Oaks, California and clearly state the basis for [Belt Con's] alleged adjustment. This written notice must be given within 48 hours of encountering the condition or incurring costs relating to the alleged adjustment. [Belt Con] hereby agrees that failure to give written notice as set forth herein shall constitute a waiver of all [Belt Con] claims for damages or an adjustment to the contract.

18.    Article 21 of the subcontract provides:

This subcontract is executed in Ventura County, California.  Any legal action between the parties to this subcontract shall be situated in Ventura County, California.

In the event of court proceedings between Contractor and Subcontractor, or if Contractor should become involved in court proceedings with Subcontractor's surety, the court shall award reasonable attorney fees to the prevailing party.  The prevailing party shall be determined as follows for the purpose of awarding attorneys fees in a Contractor, Subcontractor or Subcontractor surety dispute.

Utilizing the Plaintiff's complaint filed with the court and any modifications or amendments of said complaint, only if such modification or amendments increase the amount of judgment requested, the amount for which judgment is requested shall be considered the "Basic Complaint Amount."  Added to the Basic Complaint Amount will be any request for punitive, general, special, consequential, or incidental damages.  If any request for judgment is based upon an unspecified amount of damages, such amount to be proven at trial, then for purposes of this Article, each type of unspecified damages will be $1,000,000.00 or the amount that is proven at trial, the greater of the two in each case.  Unspecified damages for attorney's fees or pre-judgment interest will not be included for the purposes of this Article.

The sum of all types of alleged damages will be "The Total Complaint Amount".  Upon receipt of a judgment or final decision of the court, the prevailing party for the purposes of this Article will be determined as follows: If Plaintiff is awarded 50% or more of the Total Complaint Amount, including any offset for judgment arising out of Defendant's counterclaim, the Plaintiff will be the prevailing party.  Conversely, if Plaintiff is awarded less than 50% of the Total Complaint Amount, including any offset for judgment arising out of Defendant's counter claim, the Defendant will be the prevailing party.

This provision does not affect the party's rights to recover or be absolved from paying attorney fees if a party makes an offer of judgment, in accordance with applicable statutes or rules of the court.

19.     Article 33(I) of the subcontract specifies that the subcontract includes "Clean-up and removal of all debris generated by the work of this Subcontract."

20.     Specification Section 1500.1.3 requires Belt Con to:

Take necessary precautions to ensure that roof openings and other critical openings in the building are monitored carefully. Take immediate actions required to seal off such openings when rain or other detrimental weather is imminent, and at the end of each workday. Ensure that the openings are completely sealed off to protect materials and equipment in the building from damage.

21.     Specifications Section 07536.1.6  requires Belt Con to:

Furnish the roofing manufacturer's "no dollar limit" warranty for the roofing system, including insulation, flashing and accessories.  The warranty shall run directly to the government.  In no event shall the warranty period be less than 10 years from the date of the Government's acceptance of the work, notwithstanding roofing applicator's or manufacturer's unpaid invoices for installation, supplies, or service.

22.     Specification Section 07536.3.2.3.3 requires Belt Con to:

Install temporary cutoffs and watertight seals around incomplete edges of roofing assembly at the end of each day's work and when work must be postponed due to inclement weather. (Temporary cutoffs provide protection against moisture infiltration and absorption.) Straighten insulation line using pieces of insulation loosely laid, and seal EPDM sheet to deck. Remove temporary seals completely when work resumes. Provide temporary ballast on roofing as necessary to prevent wind damage to EPDM.

### 2.     Contract Balance

23.     Certain work was deleted from Belt Con's subcontract.  The two deductive changes, PS17 and PS18, were sent to Belt Con for signature agreeing to credits in the amounts of $7,523.18 and $3,472.46 respectfully.  Belt Con executed those agreements.  See Modification, executed March

15, 2002 (Exhibits AO); Amendment of Solicitation/Modification of Contract, executed March 25, 2002 (Exhibit AR).  Belt Con does not dispute these credits.  Metric is entitled to an offset of the contract balance in the amount of $10,995.64.

24.     The contract balance is a sum certain, equal to $132,256.06.

        3.      **Project Delays**

                a.      **Concrete Work**

25.     Metric and Belt Con met at the beginning of the project and discussed and settled upon a plan to construct the dormitory buildings.  See Transcript at 24:15-20 (November 1,  2004) (Beltran).  The plan was to construct the two dormitory buildings concurrently, moving from one to the other, uninterrupted, until the structural framework was complete.  See id. at 22:2-24.  After the masonry was complete on each floor, Metric and R&R Concrete would install precast concrete floor planks and structural cast-in-place concrete on top of the masonry.  See id. 215:9 - 216:13 ( Beltran and Lyn Farley, Expert Witness for Belt Con).  As R&R completed the concrete work for each floor, Belt Con would move on to that floor and lay the masonry block for the interior double wet walls and the exterior and interior traverse walls on that floor.  See id.  Belt Con could not start masonry work on a floor until R&R's work on the precast concrete floor planks, cast-in-place concrete columns, and cast-in-place concrete topping on the floor was complete.  See id. The masonry would follow the concrete work.  See id.

26.     Metric's inability to furnish and to install the precast concrete planks, the cast-in-place concrete to tie in the planks to the masonry structure, the cast-in-place columns and walkways, and the cast in place concrete topping within the time frame and within the schedule caused Belt Con to stop work when work areas were not available to it and forced Belt Con to have to reassemble a crew

-7-

and to restart the work when a work area was made available.  See id. at 23:25 - 24:8 (November 1, 2004)(Beltran).  At least at times, Belt Con had only half a floor on which to work. See id.

27.     While working on the Dormitory Buildings, R & R was concurrently working on the Firing Range project, which caused a significant drain on R&R's manpower at the Dormitory Buildings.  See Dormitory, Physical Training and Security Buildings Delay Analysis at 5 (Exhibit 3)(hereinafter "Metric's Delay Analysis").

28.     The GSA delayed the PT Building, and the concrete work on the PT Building was pushed back into August, a time frame when a significant amount of critical concrete was scheduled for the Dormitory Buildings.  See  id.  R & R could not obtain sufficient manpower to start the concrete work on the PT Building until September 2000.  See id. at 4.  Concrete activities took longer than scheduled because of R & R=s manpower shortage, and this manpower shortage  had a serious impact on Metric=s ability to complete the Dormitory Buildings' concrete work in a timely manner. See id. at 14.

29.     R&R stopped working on the FLETC project before completing its work.  Metric took over payment of materials and payroll to complete R&R's portion of the project.  See Transcript at 96:21 - 97:11 (November 3, 2004) (Sidney Pehrson, Metric's FLETC Project Manager).

30.     Metric provided a Delay Analysis to the government indicating that concrete caused the delays.  See  Metric's Delay Analysis at 2-5.  Metric is now saying that, contrary to its Delay Analysis, masonry and not concrete caused the delay.

31.     The concrete work was on the critical path and delayed the project.  See Transcript at 34:4 - 35:14  (November 1, 2004) (Beltran); Transcript at 26:3-21 (November 2, 2004)(Farley).

**b.     Masonry**

32.     The initial plan for the Dormitory Buildings indicated Belt Con was to take five weeks to install its masonry work on each floor of each dormitory.  Belt Con took more than 5 weeks per floor, delaying completion of the Dormitory Buildings.  See Transcript at 57:2-7 (November 2, 2004) (Farley).

33.     At times, Belt Con completed masonry work late even though R&R completed concrete work on time.  See Letter from Sidney Pehrson to Raymundo Beltran, dated February 6, 2001 (Exhibit I).

34.     The masonry for the Dormitory Buildings was on the critical path.  The masonry was completed late.  The late completion of the masonry delayed completion of the Dormitory Buildings phase of the project.  See Transcript at 30:22 - 35:7 (November 3, 2004) (Kurt Quick, Metric's expert witness).

### c.     Mismanagement by Metric

35.     Metric had an "adversarial relationship" with the GSA.  The "adversarial relationship" contributed to delays and disruption on the project for which the parties are seeking damages.  Letter from Lisa Byrd to Tom Miller, dated October 23, 2001; see Transcript at 20:12 - 21:11 (November 4, 2004) (Tom Miller, President of Metric).

36.     Metric did not properly update the schedule and failed to provide Belt Con with updated schedules.  See Transcript at 30:24 - 31:11 (November 1,2004)(Beltran).

### d.     Rain Damage

37.     Metric directed Belt Con to install drywall in the PT Building out of sequence.  See Metric's Delay Analysis at 2.

38.     On or around April 12, 2001, rainwater entered the Physical Training Building

damaging the drywall and insulation. <u>See</u> Transcript at 47:4 - 48:8 (November 1, 2004)(Beltran).

39.     On April 19, 2001, the GSA ordered Metric to have Belt Con discontinue installation of any new drywall until all damaged and unacceptable drywall had been replaced.  <u>See</u> Facsimile from Lisa Byrd, GSA Contracting Officer, to Sidney Pehrson, Metric's FLETC Project Manager, dated April 19, 2004 (Exhibit Q).  Metric passed the order to Belt Con. <u>See</u> Metric's Delay Analysis at 7; Transcript at 47:4 - 48:8 (November 1, 2004)(Beltran).

40.     On May 14, 2001, the GSA threatened to terminate Metric's contract unless Metric submitted an acceptable plan to correct deficiencies that included repairing the damaged drywall, correcting the blocked weepholes, and removing the extensive mortar droppings behind the drywall. <u>See</u> Lettter from Lisa Byrd to Tom Miller, dated May 14, 2001 (Exhibit W).  Metric submitted a plan, which allowed Belt Con to proceed with the work. <u>See</u> Letter from Sidney Pehrson to Lisa Byrd, dated May 4, 2001 (Exhibit U).[3]  The drywall replacement delayed the interior work on the PT Building. <u>See</u> Transcript at 47:4 - 48:8 (November 1, 2004); Transcript at 7:22-25 (November 3, 2004)(Pehrson).

41.     Metric has not proved by a preponderance of the evidence that the GSA should have stopped work on the drywall while a repair procedure was obtained and approved or that the GSA's actions were reasonable under the circumstances.

42.     Metric has not proved by a preponderance of the evidence that the delays caused by the damaged drywall were the result of Belt Con failing to properly protect the interior materials.

### e.     Mortar Droppings

---

[3] The May 4, 2004 date on the letter was incorrect and the letter was in response to the GSA's request for a corrective plan.  <u>See</u> Transcript at 10:17-23 (November 3, 2004)(Pehrson).

43.     While removing the damaged and unacceptable drywall, the GSA discovered that Belt Con had allowed mortar droppings to build up between the brick and the exterior sheeting, blocking the masonry weep holes.  See Transcript at 178:11 - 180:2  (November 1, 2004) (Beltran); Transcript at 15:11 - 16:12 (November 3, 2004)(Pehrson).

44.     Metric required Belt Con to remove the mortar droppings in areas as the GSA directed.  Metric also required Belt Con to drill new weep holes in other areas with mortar droppings. See Letter from Lisa Byrd to Tom Miller, dated May 14, 2001 (Exhibit W); Transcript at 179:21 - 180:2 (November 1, 2004)(Beltran).

45.     Metric has not proved by a preponderance of the evidence that the GSA should have stopped work on the drywall while a repair procedure was obtained and approved or that the GSA's actions were reasonable under the circumstances.

46.     Metric has not proved by a preponderance of the evidence that allowing mortar droppings between the brick and exterior sheeting caused delays.

        **4.     Notice**

47.     In a letter to Metric dated January 4, 2001, Beltran first notified Metric that R & R was delaying Belt Con=s work and costing Belt Con overhead expenses because R & R was not able to deliver work areas for the masonry work. See Letter from Raymundo Beltran to Sidney Pehrson, dated January 4, 2004 (Exhibit 27).

48.     In a letter to Metric dated April 20, 2001,  Belt Con again notified Metric that the concrete work was delaying its work.  See Letter from Raymundo Beltran to Sidney Pehrson, dated April 20, 2001 (Exhibit 32).

49.     Belt Con and Sage Consultants, Farley's company, sent numerous other letters to

Metric in 2001 complaining about not having access to work areas, stopping and starting, and other complaints.  See Letter from Beltran to Pehrson, dated April 20, 2001 (Exhibit 33); Letter from Raymundo Beltran to Sidney Pehrson, dated  June 5, 2001 (Exhibit 43);  Letter from Raymundo Beltran to Sidney Pehrson, dated June 6, 2001 (Exhibit 45); Letter from Raymundo Beltran to Sidney Pehrson, dated June 6, 2004 (Exhibit 46); Letter from Raymundo Beltran to Sidney Pehrson, dated June 7, 2001 (Exhibit 49); Letter from Raymundo Beltran to Sidney Pehrson, dated June 19, 2001 (Exhibit 51); Letter from Raymundo Beltran to Sidney Pehrson, dated August 15, 2001 (Exhibit 61); Letter from Lyn Farley to Sidney Pehrson, dated August 28, 2001 (Exhibit 65); Letter from William Derrick, counsel for Belt Con, to Sidney Pehrson, dated September 21, 2001 (Exhibit 67); Letter from Raymundo Beltran to Sidney Pehrson, dated October 4, 2001 (Exhibit 72).

50. On September 21, 2001, Belt Con=s attorney wrote to Metric explaining that Metric had delayed Belt Con and specifically notifying Metric that a claim would be filed: ABelt Con will seek an adjustment to the contract time and amount for those items for which you have been notified in writing.   A detail of these claims will be submitted prior to completion.@ See Letter from William Derrick to Sidney Pehrson, dated September 21, 2001 (Exhibit 67).

51. On December 5, 2001, Belt Con's counsel wrote to Metric's bonding company enclosing a letter from Farley of Sage Construction Consulting, that addressed complaints that Metric had raised and again referring to delays that Metric had caused, and damages to Belt Con from those delays. Metric continued to withhold payment from Belt Con.  See Letter from William Derrick to Gene Sawyer, Safeco Insurance Company, dated December 5, 2001 (Exhibit 98).

52. On March 28, 2002, after receiving no satisfaction from Metric or its bonding company, Metric filed its claim.  See Letter from William Derrick to Tom Miller, dated March 28,

-12-

2004 (Exhibit 107).

53.    Metric acknowledged concrete delays in its notices to the government, in its claims to the government, and in its Delay Analysis submitted to the government. <u>See</u> Metric's Delay Analysis at 3-5.    Metric had actual notice that the concrete work was causing delays to Belt Con's work.

### 5.    Belt Con's Delay Damages

54.    Metric did not recover any moneys from the GSA for delays that the GSA caused. <u>See</u> Settlement Agreement and Release (executed March 16, 2004)(Exhibit 4).

### 6.    Underbilling

55.    Belt Con's underbilling claim included inaccurate information that Belt Con supplied to Farley. Belt Con did not prove by a preponderance of the evidence that Metric did not make complete and timely payments.  <u>See</u> Transcript at 100:12 - 105:5 (November 2, 2004)(Farley).

### 7.    Clean Up Costs

56.    Belt Con did not clean up some of its work and remove some of its debris and rubbish from the site.  <u>See</u> Transcript at 100:12 - 105:5 (November 1, 2004) (Beltran); Transcript at 55:1 - 59:13 (November 3, 2004) (Pehrson).

57.    Metric incurred costs associated with clean up, debris, and rubbish removal that Belt Con did not perform, entitling Metric to damages in the amount of $6,000.  <u>See</u> <u>id</u>.

### 8.    Roof Warranties

58.    The GSA requested Metric provide it with roof warranties. Metric requested Belt Con provide the roof warranties.  Belt Con has not provided Metric with the roof warranties that the contract required and has refused to do so.  <u>See</u> Transcript at 14:12 - 15:10, <u>id</u>. at 124:20 - 126:10

(November 4, 2004)(Pehrson).

59.   Metric attempted to procure warranties; however, Metric had difficulty finding a roofing contractor that would warrant another contractor's roof installation. See id.

60.   Metric has not shown by a preponderance of the evidence that it has suffered any damage regarding the roof warranty. See id.

### 9.   Liquidated Damages

61.   The project had three separate phases.  Each phase had its own liquidated damages if the contractor, Metric, failed to complete its work within the time specified in the contract.  The three phases were: (1) Phase I for the Dormitory Buildings in the amount of $1,200/day; (2) Phase II for the Physical Training Building in the amount of $2,000/day; and (3) Phase III for the Security Building in the amount of $750/day. See Letter from Lisa Byrd to Sidney Pehrson, dated February 11, 2002 (Exhibit AK).

62.   The GSA assessed liquidated damages of $320,800 against Metric for late completion of the project including $178,000 for 89 days of delay to the Physical Training Building at $2,000 per day and $142,800 for 119 days of delay for the Dormitory Buildings at $1,200 per day. See id.

63.   On March 9, 2004, Metric and the GSA entered into a settlement agreement whereby Metric settled all of its claims on the project and the firing range project for $662,500.00. See Settlement Agreement and Release (executed March 16, 2004)(Exhibit 4).

64.   The GSA withheld $66,000 in liquidated damages from Metric's contract.  The GSA has not released those liquidated damages and maintains those liquidated damages were rightfully withheld. See id.

### COURT'S CONCLUSIONS OF LAW

-14-

The Court makes the following conclusions of law:

## I.  Jurisdiction and Venue

A.     Belt Con brought this action pursuant to the Miller Act, 40 U.S.C. §§ 3131-33. Jurisdiction over this matter exists by virtue of the provisions of the Miller Act, as well as 28 U.S.C. §§ 1331, 1345, and 1352.

B.     Venue is properly laid in this District pursuant to the Miller Act and 28 U.S.C. § 1391(b)(2).

## II.  Choice of Law

C.      In the United States District Court for the Tenth Circuit, federal courts look to the conflict laws of the forum state to determine which state law applies. See Mountain Fuel Supply v. Reliance Ins. Co., 933 F.2d 882, 887 (10th Cir. 1991); Rhody v. State Farm Mutual Ins. Co., 771 F.2d 1416, 1418 (10th Cir. 1985). The Court looks to New Mexico law to determine which state law will be controlling. New Mexico has a strong public policy in favor of freedom of contract and will enforce a choice of law provision unless the law of the state provided for in the contract offends state public policy.  See Reagan v. McGee Drilling Corporation, 123 N.M. 68, 70, 933 P.2d 867, 869 (Ct. App. 1997).

D.     Courts in New Mexico determine a contract dispute by applying the law of the place where the contract was executed.  To overcome the rule favoring the law where the contract was executed, "there must be a countervailing interest that is fundamental and separate from general policies of contract interpretation." Shope v. State Farm Ins. Co., 122 N.M. 398, 400, 915 P.2d 515, 517 (1996).

E.     Article 21 of the subcontract provides that the subcontract is executed in California.

-15-

Neither the parties nor the Court have identified a countervailing interest that is so fundamental and separate from general policies of contract interpretation that the Court should not apply California law.  Applying New Mexico's conflict of laws rules, the law of the state of California, in which the contract was executed, applies to the contract.

III.   **Use Plaintiff's Claim**

      1.    **Contract Balance**

F.      Belt Con is entitled to recover from Metric the contract balance in the amount of $132,256.06.

      2.    **Prejudgment Interest on Contract Balance**

G.      Cal Civ Code § 3287(a) provides:

(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state.

H.      Cal. Civ. Code Section 3289(b) provides: "If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10% per annum after the breach.@

I.      Belt Con is entitled to recover pre-judgment interest on the contract balance at 10% per annum.  The parties stipulated to September 10, 2001 as the date for the PT Building's substantial completion.   The parties stipulated to November 14, 2001 as the date for the Dormitory Buildings' substantial completion.  Belt Con is entitled to recover Pre-judgment interest for the period starting November 14, 2001 and ending the date of this order.

### 3.    Application of Article 8

J.      Belt Con's claims for costs due to inefficiencies and out of sequence work and equipment and support damages are, in form and reality, claims for delay damages. The "no damage for delay" in Article 8 of the subcontract precludes Belt Con from recovering damages for delay.  A "no damage for delay" clause, however, does not cover delays amounting to a breach of contract. See Hawley v. Orange County Flood Control Dist., 211 Cal.App. 2d 708, 714 (Cal. Ct. App. 1963); D. A. Parrish & Sons v. County Sanitation Dist., 174 Cal.App.2d 406, 414, 344 P.2d 883, 887 (Cal. Ct. App. 1959).

K.      Belt Con has not proved by a preponderance of the evidence that the delays caused by Metric  amount to a breach of contract.  Thus, Article 8 bars Belt Con from recovering its damages.

### 4.    Application of Article 19

L.      Article 19 allows Belt Con to seek an adjustment to the contract amount for "changes to the contract including changes in the scope of work, extra work, delays to contract performance, [or] impact damages associated with either changed work or contract work."  To receive an adjustment to the contract amount, Belt Con must notify Metric in writing, by facsimile and mail and "clearly state the basis for [Belt Con's] alleged adjustment" within 48 hours of encountering the condition or costs relating to the adjustment.

M.      Some of Belt Con's letters to Metric indicate that Belt Con's work is being delayed; however, none of the letters request an adjustment to the contract amount or specify a basis for an adjustment.  The first time that Belt Con gave Metric any amount for an adjustment was March 28, 2002, in Belt Con's claim for economic compensation on the FLETC project. See Letter from

-17-

Raymundo Beltran to Sidney Pehrson, dated March 28, 2002 (Exhibit 107).

N.      Metric has not proved by a preponderance of the evidence that it gave adequate notice pursuant to Article 19 for the alleged damages because of inefficiencies and out of sequence work in the amount $147,002.

O.      Metric has not proved by a preponderance of the evidence that it gave adequate notice pursuant to Article 19 for the alleged damages relating to equipment and support damages in the amount of $63,157.85.

## IV.      Defendant's Counterclaim

### 1.      Clean Up Costs

P.      Articles 16 and 33(I) of the subcontract required Belt Con to clean-up its work areas on a daily basis and remove debris.  If Belt Con failed the perform this work, the subcontract allowed Metric to perform the work and deduct the costs from sums otherwise due Belt Con.  Belt Con failed to clean-up all of its work and haul away all its debris.  Metric performed that work at a labor and hauling cost of $6,000; therefore, Metric is entitled to recover $6,000 for these costs.  These damages have been proved by a preponderance of the evidence.

Q.      The 10% fee for supervision and coordination prescribed in Article 18 of the Subcontract is applicable when the Subcontractor defaults and the Contractor ejects the Subcontractor and takes over the Subcontractor's portion of the work.  Metric is not entitled to recover this fee for the clean up costs.

### 2.      Roof Warranty

R.      The subcontract required Belt Con to provide Metric with roof warranties for the multiple buildings on the project.  Belt Con refused to provide the roof warranties.  Metric remains

-18-

liable to the GSA for any warranty items that may arise relating to the roof. Metric has not, however, proved that it has been damaged. Metric largely relies on a quote it received for a warranty. Such evidence of damages is speculative and conjecture. Metric is not entitled to damages resulting from Belt Con's breach in failing to provide the roof warranties. Metric has not proved by a preponderance of the evidence damages for Belt Con's failure to provide the roof warranties.

### 3.     Liquidated Damages

S.     "Liquidated damages are a penalty not favored in equity and should be enforced only after he who seeks to enforce them has shown that he has strictly complied with the contractual requisite to such enforcement." Aetna Cas. & Surety Co. v. Bd. of Trustees, 223 Cal.App.2d 337, 340 (Ct. App. Cal. 1963)(citations omitted). When "delays are occasioned by the mutual fault of the parties the court will not attempt to apportion them but will refuse to enforce the provision for liquidated damages." Gen. Ins. Co. of America v. Commerce Hyatt House, 85 Cal. Rptr. 317, 325 (Ct. App. Cal. 1970)(quoting Gogo v. Los Angeles County Flood Control Dist., 114 P.2 64, 71 (Cal. Ct. App. 1941).

T.     Metric and other subcontractors delayed the FLETC project concurrently with Belt Con. Because Metric and other subcontractors contributed to the delay, Metric is not entitled to recover liquidated damages from Belt Con. Also, because Metric did not prove by a preponderance of the evidence how much, if any, delay should be attributed to Belt Con, any award of damages would be speculative.

## V.     Attorney Fees

U.     California Civil Code § 1717 specifically applies to attorney fee provisions in contracts. Subdivisions (a) and (b)(1) provide in relevant part as follows:

-19-

§ 1717.  Contract provision for attorney fees and costs

(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract.

Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit.

Attorney's fees provided for by this section shall not be subject to waiver by the parties to any contract which is entered into after the effective date of this section. Any provision in any such contract which provides for a waiver of attorney's fees is void.

(b)(1) The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section.

Cal. Civ. Code § 1717.

V.      Section 1717 "commands that equitable considerations must rise over formal ones.

Building a reciprocal right to attorney fees into contracts, and prohibiting its waiver, the section

reflects legislative intent that equitable considerations must prevail over both the bargaining power

of the parties and the technical rules of contractual construction." Sears v. Baccaglio, 70 Cal. Rptr.

2d 769, 780 (Cal.App. 1998)(quoting Intl. Indus., Inc. v. Olen, 21 Cal. 3d 218, 224, 577 P.2d 1031,

1034 (1978)).  The aim of §1717 is to "avoid[] . . . narrowly defined procedures, which have been

seen as favoring the dominant party, in favor of an equitable consideration of who should fairly be

regarded as the winner." <u>See</u> <u>Sears v. Baccaglio</u>, 70 Cal.Rptr.2d 769, 777 (Cal.App. 1998).

The award of attorney fees is allowed by statute, rather than contract. The party prevailing and

reasonable attorneys fees are to be fixed by the court. <u>See</u>  <u>PLCM Group, Inc. v. Drexler</u>, 997 P.2d

511, 515 (Cal. 2000).

      W.     The Court concludes that Belt Con is the party prevailing on the contract.  Belt Con

shall submit its application for fees and costs pursuant to the Court's local rules and the Federal Rules

of Civil Procedure.

## VI.     Conclusion

      X.     The contract balance that Metric owes Belt Con is $132,256.06, but is offset by

$6,000.00 that Metric is entitled to recover for clean up costs.  Metric thus owes $126,256.06 plus

prejudgment interest on the contract balance in the amount of $39,467.99.  Thus, Metric owes Belt

Con $165,724.05 total, plus attorney fees and costs.


                                  _____
                                    UNITED STATES DISTRICT JUDGE

*Counsel*:

Francis S. Ainsa, Jr.
Michael F. Ainsa
El Paso, Texas

– and –

Travis R. Collier
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, NM

– and –

William J. Derrick
Law Office of William J. Derrick, P.C.
El Paso, Texas

    *Attorneys for the Use Plaintiff*

Christian C. Doherty
Albuquerque, NM

– and –

James B. Reeves
Reeves, Chavez, Albers, Anderson & Baca, P.A.
Albuquerque, New Mexico

– and –

Steven D. Meacham
Dann & Meacham
Seattle, Washington

    *Attorneys for the Defendants*